UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARK A. SHANNON,                                )<br>                                                              )<br>                    Plaintiff,              )<br>    vs.                                               )       Case No. 1:15-cv-0807-WTL-TAB<br>                                                              )<br>REBECCA TRIVETT, et al.,              )<br>                                                              )<br>                    Defendants.        ) | |

**Entry Discussing Defendants' Motion for Summary Judgment and Plaintiff's Opposition
and Directing Entry of Final Judgment**

For the reasons explained in this Entry, the defendants' motion for summary judgment [dkt. 31] is **granted** and the plaintiff's motions in opposition to defendants' summary judgment [dkt. 39] and [dkt. 42] are **denied.**

**I. Background**

The plaintiff in this 42 U.S.C. § 1983 civil rights action is Mark Shannon ("Mr. Shannon"), an inmate who at all relevant times was confined at the Plainfield Correctional Facility ("Plainfield"). The defendants are Rebecca Trivett, LPN ("Nurse Trivett"), Toni Jordan, LPN ("Nurse Jordan"), and Dr. Murat Polar ("Dr. Polar"). In his amended complaint, Mr. Shannon alleges that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. He seeks compensatory and punitive damages.

The defendants seek resolution of the plaintiff's claims through summary judgment. The plaintiff has responded to the defendants' motion for summary judgment and the defendants have replied.

## II.  Summary Judgment Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

## III.  Discussion

### A.  Undisputed Facts

On the basis of the pleadings and the portions of the expanded record that comply with the requirements of Rule 56(c)(1), construed in a manner most favorable to Mr. Shannon, the non-movant, the following facts are undisputed for purposes of the motion for summary judgment:

On July 11, 2014, Mr. Shannon was working in the prison laundry. While loading laundry, the outer door of a washing machine slammed down on his hand. Custody staff sent a

radio transmission indicating that there was a medical emergency in Pen Laundry. Nurse Trivett was in the area so she met him at the entrance of Pen Laundry. Mr. Shannon was experiencing a great amount of pain. Nurse Trivett and Mr. Shannon went to the infirmary. Nurse Trivett's examination revealed that his right hand was red and swollen. He had some range of motion; his pulses were normal; there was no bleeding or broken skin; and no sign of fracture. Nurse Trivett stated in her notes that Mr. Shannon's right thumb was popping in and out of place. She did not rule out a possible fracture, dislocation, or other injury to the hand. Nurse Trivett entered an order that Mr. Shannon be referred to a medical provider as soon as possible instead of through routine scheduling because he needed an x-ray of his right hand. Nurse Trivett assessed the injury, then prescribed ice compresses and pain medication. She also entered an order restricting his activities for five days. She immobilized his right hand by wrapping it with an ace bandage. Immobilizing the hand with the bandage inhibited motion of the hand, thus minimizing pain and discomfort along with preventing aggravation of the injury, while compensating for swelling.

As a licensed practical nurse, Nurse Trivett had training and experience in evaluating sprains, strains and fractures. Her duties at Plainfield included evaluating and recommending treatment or further assessment of sprains, strains and fractures. In situations where Nurse Trivett evaluates a patient and determines that a physician or outside care is indicated, she recommends that a physician be called or that the inmate be transported to a hospital. There is no x-ray technician on site at Plainfield. A patient must be scheduled for an off-site radiology visit when an x-ray is recommended.

Mr. Shannon was seen again in the facility clinic on July 16, 2014, by medical provider Nurse Practitioner Loice Mukona ("Nurse Mukona"). Dkt. 32-2, pp. 5-10. An x-ray was ordered at that time and Nurse Mukona ordered that Mr. Shannon's hand continue to be kept in an ace-

wrap bandage. *Id.* at p. 7. Nurse Mukona noted that Mr. Shannon's right hand was swollen and bruised. She noted that there was no open wound from his injury, but that he reported being unable to bend his right thumb.

Mr. Shannon alleges that he also saw "Nurse Practitioner Dana Wilson" in the infirmary on or before July 16, 2014, and she made and applied a splint to his hand and re-wrapped it with an elastic ace bandage. The only July 2014 medical record referencing a medical provider named NP Dayna L. Wilson is dated July 31, 2014. Dkt. 32-2, p. 16. That Chart Update states that Mr. Shannon refused CC labs, and has no mention of a splint. *Id.*

Daniel Altman, M.D., outside radiologist, reported that an anteroposterior (front to back) and a lateral view x-ray were taken of Mr. Shannon's right hand on July 18, 2014. The findings in the radiology report were as follows: "There is no acute fracture or dislocation. Joint spaces appear normal. Soft tissues are unremarkable. No erosions. There is a chronic healed fracture of the 5th digit metacarpal." Dr. Altman's impression was: "No acute osseous abnormality or significant degenerative change." Dkt. 32-2, p. 11.

On July 31, 2014, Mr. Shannon was seen by Nurse Mukona for a follow-up on the x-ray results. Although the July 18 x-ray results did not reflect a fracture or dislocation of the thumb, Mr. Shannon's thumb was still swollen and he was unable to bend the thumb. Nurse Mukona consulted with Dr. Polar who suggested that Mr. Shannon might have a tendon injury and that further follow up was clinically indicated. Nurse Mukona continued treatment of Mr. Shannon's injury by immobilizing his right hand with an ace bandage and splint. She also requested an outside orthopedic consultation per Dr. Polar's recommendation. Dkt. 32-2, pp. 12-14. On August 6, 2014, Nurse Mukona saw Mr. Shannon for a chronic care visit related to other conditions. At that appointment, Mr. Shannon reported continued pain in his right hand. A right

wrist brace was given to him to use while he was waiting for his orthopedic visit. Dkt. 32-2, p. 17, 20.

On August 13, 2014, another set of x-rays of Mr. Shannon's right hand was taken in conjunction with his scheduled outside orthopedist appointment. The findings in the August 13, 2014, radiology report entered by radiologist, Daniel Altman, M.D., were as follows: "There is a mildly displaced fracture at the ulnar base of the first digit metacarpal with extension into the carpometacarpal [CMC] joint. The smaller triangular fragment is displaced proximally by approximately 1mm. There is an old healed fracture of the 5th digit metacarpal." Dr. Altman's impression was: "Bennett's fracture without significant subluxation." Dkt. 32-2, p. 26.

A Bennett's fracture is a fracture at the base of the thumb. It is usually accompanied by some degree of subluxation (dislocation) of the thumb. It can be treated by closed reduction (setting the bone without surgery and immobilizing affected hand with cast) or by surgery to stabilize the fracture. Stable maintenance of the joint is the key to a successful outcome. Dkt. 32-3, ¶ 10. It is not clear why the July 18, 2014, radiology report from Dr. Altman did not reflect any evidence of a fracture or dislocation in Mr. Shannon's right hand and the August 13, 2014, radiology report from the same outside radiologist reflected "a mildly displaced fracture at the ulnar base of the first digit metacarpal with extension into the carpometacarpal joint."

On August 15, 2014, Dr. Christopher Glock, an outside orthopedic specialist, examined Ms. Shannon's right thumb. Dkt. 32-2, pp. 32-33. Dr. Glock reported that the August 13, 2014, x-rays of Mr. Shannon's right hand showed a "significant step up." *Id.* at p. 27. A CT scan was completed to evaluate the apparent fracture at the base of the right thumb. *Id.* at pp. 27, 34. Dr. Glock concluded that surgical repair of Mr. Shannon's right hand would be required. Corizon's Regional Medical Director approved the recommended surgery.

On August 29, 2014, out-patient surgery was performed by Dr. Glock on Mr. Shannon's right hand. During surgery, Dr. Glock discovered significant arthritis and determined that his initial plan of open reduction and internal fixation of the thumb fracture was not appropriate based on the condition of the CMC joint surface. Dkt. 32-2, p. 80. Instead, Dr. Glock performed a surgical procedure involving an excision of the trapezium bone in the wrist and a tendon transfer to the metacarpal (thumb) base as the best option for restoring normal function of the thumb. Dkt. 32-2, pp. 29-31.

In Dr. Glock's August 29, 2014, post-operative discharge instructions, he prescribed ice therapy, Ibuprofen, Norco 7.5/325 for pain (as needed), and an antibiotic. Dkt. 32-2, pp. 35, 40. Ice therapy or cold compression therapy is often prescribed by orthopedic surgeons to reduce pain and swelling after surgery. It can be implemented by use of re-freezable ice packs or by use of a continuous cold therapy device (such as a Breg Kodiak Polar device) which is a motorized (pump-driven) device with wrap-on cooling pads. Dkt. 32-3, ¶16.

On August 29, 2014, at approximately 8:37 p.m., Mr. Shannon returned to Plainfield from his outpatient surgery and was seen for intake by Nurse Jordan in the facility infirmary. Nurse Jordan noted in a Chart Update that Mr. Shannon had a cast on his right arm and some swelling in his right hand. Upon Mr. Shannon's return to the facility, Nurse Jordan called Dr. Polar, as the physician on duty, for post-surgery orders. In accordance with the orthopedic surgeon's discharge orders, Dr. Polar prescribed Norco for pain relief as needed, polar ice treatment (to minimize swelling), and Clindamycin (an antibiotic prescribed for two days as a precaution against infection). Dr. Polar ordered that Mr. Shannon be treated in the facility infirmary. Dkt. 32-2, p. 41.

When Mr. Shannon was informed that he would need to be treated in the infirmary, he refused to be housed in the infirmary and stated he wanted to return to his dorm. Mr. Shannon states that he was told by Nurse Jordan that if he did not remain in the infirmary he would not receive his medications. Nurse Jordan noted that if Mr. Shannon had been allowed to return to his cell, there was no electrical outlet in his cell near his bottom bunk that could be used with the prescribed polar ice machine. The medical chart was updated with "refuses bed assignment, refuses medication, and refuses treatment." Dkt. 32-2, p. 41.

At approximately 9:00 pm, Nurse Jordan contacted Dr. Polar again and advised him that Mr. Shannon insisted on returning to his cell and that he refused to follow medical orders. Nurse Jordan noted that based on Mr. Shannon's refusal to be treated in the infirmary, his initial medication orders had to be discontinued and new orders substituted. Because Mr. Shannon insisted on returning to his dorm, Dr. Polar verbally substituted a prescription for ice compresses for the polar ice machine to address potential swelling and protocol pain reliever Tylenol. Per Dr. Polar's instructions, Nurse Jordan advised Mr. Shannon of the risk of infection if he refused the antibiotic treatment prescribed by his medical providers. She advised him to elevate the affected hand as much as possible and not to remove the dressing. Dr. Polar further ordered that Mr. Shannon be placed on restricted recreation for two weeks.

As a licensed practical nurse, Nurse Jordan did not have the authority to discontinue a medical provider's prescription for medications or medical treatment. She followed the prescriptions entered by Dr. Polar.

On September 1, 2014, Mr. Shannon submitted a Request for Health Care form (RFHC #198388) in which he states that upon his return to the facility from surgery Nurse Jordan told him that she was placing him in the infirmary. In his RFHC form, he admits that he refused to be

treated in the infirmary and then states that "Nurse Jordan and Dr. Polar refused to provide me with medical treatment, antibiotics, pain meds and a Breg Kodiak Polar Care Therapy machine as ordered by Dr. Glock." Dkt. 32-2, p. 142. The Response to this RFHC form was that Mr. Shannon's medical records reflected that he was currently taking Norco and Clindamycin and had received the polar ice. Dkt. 32-2, p. 142.

Mr. Shannon states that on September 2, 2014, the Superintendent ordered him to be admitted to the facility infirmary for observation and treatment as follow-up to his right thumb surgery. Upon admission to the infirmary, Mr. Shannon showed no signs of distress. He was treated with a polar ice machine and, at Mr. Shannon's request, Dr. Polar ordered Norco, a non-formulary pain medication, as treatment for reported pain. Dkt. 32-2, p. 44.

On September 3, 2014, Mr. Shannon was resting quietly in bed and inquired when he would be discharged from the infirmary. His dressing and thumb splint were clean, dry and intact. The cold therapy machine had been applied to his right hand. His vital signs were normal and he showed no signs of distress. Dkt. 32-2, pp. 51-52. On September 3, 2014, at approximately 10:00 am, Dr. Polar discharged Mr. Shannon from the infirmary to general population. Dkt. 32-2, p. 57. Mr. Shannon had received polar ice therapy along with narcotics and was doing much better.

On September 5, 2014, one week after surgery, Mr. Shannon was seen for a follow-up visit with Dr. Glock. The casting was removed. The sutures were still intact. Dr. Glock reported that the wound was healing beautifully, there were no signs of infection, and that x-rays reflected excellent alignment of the thumb. Mr. Berryman was placed in a short arm thumb spica cast. Dr. Glock prescribed that Mr. Shannon be treated in the facility infirmary while he was receiving polar ice therapy. Dkt. 32-2, pp. 61 and 80.

On September 19, 2014, Mr. Shannon was seen again by Dr. Glock. Dr. Glock reported that Mr. Shannon had good digital range of motion and good thumb joint range of motion in his right hand. His cast was replaced and he was scheduled for another follow-up visit in three weeks. Dkt. 32-2, pp. 82-84.

On October 17, 2014, Mr. Shannon was seen for a follow-up visit with Dr. Glock. Mr. Shannon's cast was removed. Dr. Glock reported that Mr. Shannon was progressing well and recommended that he begin range of motion exercises. Dkt. 32-2, pp. 89-90.

On October 29, 2014, Mr. Shannon was seen for the first of six physical therapy visits prescribed to rehabilitate and improve functionality in his right hand. He was educated on various range of motion/strengthening exercises. Dkt. 32-2, p. 93. On November 5, 2014, and November 12, 2014, he was seen for additional physical therapy visits. *Id.* at pp. 97, 100. The physical therapist reported he was doing well and showed improved strength and range of motion in his right hand. On December 3, 2014, and December 10, 2014, Mr. Shannon was seen for physical therapy sessions and reported that he believed his thumb was slowly improving. *Id.* at pp. 106, 112.

On January 20, 2015, based on the recommendation of Mr. Shannon's orthopedic surgeon, Dr. Polar requested that Mr. Shannon be evaluated for further occupational therapy to increase mobility of his thumb. On February 16, 2015, a note was entered in Mr. Shannon's chart reflecting that he had refused his prescribed occupational therapy evaluation at Terre Haute Regional Hospital on February 13, 2015. Dkt. 32-2, p. 116.

Throughout the course of his incarceration, Mr. Shannon has refused treatment over a dozen times for prescribed or requested provider visits, lab work, and some physical and occupational therapy appointments. Dkt. 32-2, pp.117-136.

## B. Analysis

At all times relevant to Mr. Shannon's claims, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). Mr. Shannon alleges that the defendants were deliberately indifferent to his serious medical needs after his hand was injured on July 11, 2014.

To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 8374 (1994); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014).

For purposes of summary judgment, the parties do not dispute the first element, that Mr. Shannon had a serious medical need.

*Nurse Trivett*

With respect to Nurse Trivett, Mr. Shannon contends that she offered him minimal to no treatment. He argues that she should have contacted the on-call provider or sent him to the hospital rather than recommend that he be seen by a physician as soon as possible to obtain an x-ray.

Mr. Shannon argues that Nurse Trivett should have sent him to the hospital because the fracture would have thereby been discovered immediately. "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Jackson v. Pollion,* 733 F.3d 786, 790 (7th Cir. 2013) (internal quotation omitted). Mr. Shannon has shown no harm caused by the alleged delay in being sent to an outside provider. Indeed, the first x-ray, as reviewed by an outside radiologist, did not reveal a fracture.

Mr. Shannon also asserts that the fact that his thumb was popping in and out of place indicated that it was fractured. He presents nothing other than his own lay opinion in support of this conclusion. The medical providers who examined Mr. Shannon's thumb were aware that it popped in and out of place, but none opined that such symptom meant that it was fractured. Instead, the providers relied on x-ray and CT scan results to make that determination.

In addition, Mr. Shannon argues that Indiana Department of Correction ("IDOC") Health Service Directive (5)(p3) supports his opinion that his injury presented an emergency situation. He alleges that it states, in part:

> Health care staff should assess the situation, as well as may be possible, using all available information, including (when possible) the patient's health record, and plan their response accordingly. In the extreme or unclear cases, emergency care should be provided immediately.

Plaintiff's Brief in Opposition, dkt. 40, p. 16.

Assuming for purposes of this Entry that the IDOC directive states the above, the critical determination remains whether or not a situation presents an "extreme or unclear case." The directive does not define whether any given case is extreme or unclear. That determination must

be made by "health care staff." Nurse Trivett exercised her medical judgment and determined that Mr. Shannon's hand did not require emergency treatment beyond what she provided. Mr. Shannon obviously disagrees with Nurse Trivett's decision not to call the on-call physician or send him by ambulance to an outside hospital, however, disagreement with a provider's medical judgment is not enough to prove deliberate indifference. *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010). Even if Mr. Shannon had shown negligence on the part of Nurse Trivett, which he has not, that would not be sufficient to demonstrate a violation of the Eighth Amendment. *Pyles,* 771 F.3d at 409 (7th Cir. 2014) ("Something more than negligence or even malpractice is required.").

The July 11, 2014, medical chart reads "Referred to provider – needs x-ray of hand d/t injury and Timeframe- ASAP." Dkt. 32-2, p. 4. Nurse Trivett also immobilized the hand and prescribed pain medication and ice compresses. Mr. Shannon has provided no evidence that such treatment and referral fell below the applicable standard of care.

Nurse Trivett and Mr. Shannon have submitted conflicting sworn statements as to whether or not she placed Mr. Shannon's hand in a "splint" to immobilize it. She says that she immobilized the hand with a splint and ace bandage and he says she only applied the bandage. The medical record states that Nurse Trivett immobilized the injury "with elastic bandage/splint." Dkt. 32-2, p. 2. Mr. Shannon argues that his hand was not put in a splint until July 16, 2014, when he saw Nurse Practitioner Dana Wilson. As noted, however, the record reflects that on July 31, 2014, NP Dayna L. Wilson saw Mr. Shannon when he refused Chronic Care labs, but there was no mention of a splint. The record further reflects that Nurse Mukona saw Mr. Shannon on July 16, 2014, and ordered the same treatment, that the ace bandage be kept

on. Dkt. 32-2-, p. 7. Regardless of whether a splint was applied at either time, it is undisputed that the hand was immobilized by Nurse Trivett. Any further distinction is not material.

Nurse Trivett's decision to refer Mr. Shannon to be seen by a medical provider and obtain an x-ray as soon as possible was not deliberately indifferent to his medical condition. She stabilized the hand and thumb and prescribed ice compresses and pain medication. Mr. Shannon's own opinion of what should have happened immediately after he sustained his injury does not outrank Nurse Trivett's professional medical judgment. Mr. Shannon has presented no evidence showing that Nurse Trivett's treatment was inappropriate or that she disregarded any substantial risk of harm.

*Nurse Jordan and Dr. Polar*

Mr. Shannon alleges that Nurse Jordan and Dr. Polar acted with deliberate indifference by discontinuing his antibiotics, pain medication, and the Breg Kodiak Cold Therapy Machine from August 29 until September 2, 2014. Mr. Shannon alleges that when he returned to the prison after surgery, he was hungry and interrupted Nurse Jordan from her other sick call duties asking about a chicken plate of dinner that he believed had been set aside for him while he was at the hospital. She allegedly told him he would have to sit down and wait his turn. He asked Nurse Jordan again to process his papers so he could go to his unit and eat and lay down. The nurse told him again to wait his turn. When she finished her sick call offenders, she told Mr. Shannon that she was placing him in the infirmary. Mr. Shannon asked about the chicken plate. Nurse Jordan told him she could not find any chicken plate for him, that someone else must have eaten it. Mr. Shannon then asked for a sack lunch which the nurse allegedly denied him. Mr. Shannon then became irate. They allegedly engaged in a heated argument and Nurse Jordan called custody staff. Nurse Jordan reported to the sergeant that Mr. Shannon was cursing her out. Nurse Jordan

asked Mr. Shannon to sign a form stating that he was refusing medications and treatment. Mr. Shannon refused to sign the paper, saying that he was not denying treatment. He was refusing to stay in the infirmary. Nurse Jordan noted that there was no electrical outlet in Mr. Shannon's cell that could be used with the prescribed polar ice machine. Mr. Shannon alleges that he told Nurse Jordan that other inmates were allowed to return to their living units and access their medications through the offender medication line and use the Breg Kodiak Cold Therapy Machine in their dormitories. The two began arguing again and the sergeant told Mr. Shannon to go to his living unit.

Mr. Shannon filed a sworn declaration signed by another inmate, Brian Sanders. Mr. Sanders states that he suffered a hand injury and that after he had hand surgery, he refused to be housed in the infirmary and was allowed to use the Breg Kodiak Cold Therapy Machine in his housing unit and receive his medications through the offender pill line. Dkt. 45. While this may have been the case for this other inmate, it remains that Mr. Shannon was ordered by Dr. Polar to receive the polar ice treatment in the infirmary. Mr. Shannon refused to be treated in the infirmary, which had a ripple effect of him not receiving the polar ice machine treatment. Instead, he was provided ice compresses and was offered Tylenol. The medical records and Nurse Jordan's affidavit reflect that Mr. Shannon refused the antibiotic and was warned of the risk of infection. It is undisputed that by September 2, 2014, Mr. Shannon went to the infirmary where he was treated with the ice machine, antibiotic, and Norco for pain.

If Mr. Shannon's claim against Nurse Jordan is construed as a delay in receiving the two-day prescription for an antibiotic, he has shown no harm. When he was seen on September 5, 2014, Dr. Glock reported that the incision was healing well and there were no signs of infection. Dkt. 32-2, p. 80. The September 5, 2014, medical chart also reflects that a two-day prescription

for an antibiotic was given September 3, 2014. Dkt. 32-2, p. 61. Moreover, Mr. Shannon has presented no evidence showing that Nurse Jordan's treatment after he refused to remain in the infirmary as he was ordered to do by Dr. Polar resulted in any harm. It appears from the record that a higher level of care and stronger medications can be accessed while an inmate is being monitored in the infirmary. This is where Mr. Shannon should have remained immediately after surgery. He refused to be housed in the infirmary, but even with that, he was not denied necessary post-surgical treatment.

With respect to the claim against Dr. Polar, there is no evidence that he delayed or failed to order any medically necessary treatment for Mr. Shannon. Dr. Polar responded promptly to calls from the nursing staff and after the first x-ray showed no fracture, he referred Mr. Shannon to an orthopedic consultation. Dr. Polar prescribed pain medications as needed and ice treatment to minimize swelling. After surgery, he ordered Mr. Shannon to be treated in the infirmary for closer monitoring (which Mr. Shannon refused). After Mr. Shannon received five or six physical therapy sessions, Dr. Shannon ordered occupational therapy to increase Mr. Shannon's thumb mobility.

"A prisoner may establish deliberate indifference by demonstrating that the treatment he received was blatantly inappropriate." *Pyles,* 771 F.3d at 409 (internal quotation omitted). "Making that showing is not easy: A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Id.* (internal quotation omitted). "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.* Mr. Shannon

has not shown that the defendants' treatment was so contrary to accepted professional standards that a jury could infer that it was not based on medical judgment. *Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008).

In addition, there is no explanation in the record as to why the first x-ray did not show a fracture. What matters under the Court's analysis is whether the defendants should have somehow known that there was a fracture when the x-ray did not reveal one. The defendants argue that it was reasonable for the prison medical providers to rely on the first x-ray results which showed no fracture and treat the injury accordingly until further symptoms indicated additional assessment. The Court agrees. When Mr. Shannon continued to complain of pain, Dr. Polar recommended that his right hand be further evaluated. Mr. Shannon was sent out for a second x-ray on August 13, 2014, and was referred to an outside orthopedic specialist who performed surgery. He was seen by the surgeon at least three times post-surgery and healed "beautifully." Physical therapy was also provided to improve strength and mobility.

A court examines the totality of an inmate's medical care when determining whether a defendant has been deliberately indifferent to an inmate's serious medical needs. *Walker v. Peters,* 233 F.3d 494, 501 (7th Cir. 2000). It is well-settled that while incarcerated, an inmate is not entitled to the best possible care or to receive particular treatment of his choice. *See Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir. 1997). Mr. Shannon was "entitled to reasonable measures to meet a substantial risk of serious harm," *id.,* which is what he received.

Mr. Shannon has not met the high standard of deliberate indifference in this case. Accordingly, the defendants are entitled to summary judgment on Mr. Shannon's claims of deliberate indifference.

### IV. Conclusion

Defendants Nurse Trivett, Dr. Polar, and Nurse Jordan are entitled to summary judgment on Mr. Shannon's claims of deliberate indifference to a serious medical need. Accordingly, the defendants' motion for summary judgment [dkt. 31] is **granted** and the plaintiff's motions in opposition to defendants' summary judgment [dkt. 39] and [dkt. 42] are **denied.** Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date:  9/6/16

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution:

Mark A. Shannon, #219451
Plainfield Correctional Facility
Inmate Mail/Parcels
727 Moon Road
Plainfield, IN   46168

Electronically registered counsel